Dionisio Trigo et al., demandantes y apelados, *v.* Banco Territorial y Agrícola de Puerto Rico, demandado y apelante.  Manuel Camblor y José María del Valle, demandantes y apelados, *v.* El Banco Territorial y Agrícola de Puerto Rico et al., y Hons. Tesorero y Secretario Ejecutivo de Puerto Rico, demandados y apelante el Banco mencionado.  Manuel Camblor y José María del Valle, demandantes y apelantes, *v.* El Banco Territorial y Agrícola de Puerto Rico et al., demandados y apelados.

Nos. 3805, 3804 y 3883.—*Vistos:* Abril 29 el primero y Mayo 25 los dos
últimos, 1926.  *Resueltos:* Febrero 23, 1927.

1. Derecho Constitucional— Obligaciones de los Contratos— Poder de los Estados en General—Leyes en el Ejercicio del Poder Policiaco de los Estados—Reglamentación del Negocio de Banca.—La sección 4 transitoria de la Ley No. 18 de 1923 (2) p. 85 haciendo ésta aplicable a los bancos que actualmente están haciendo negocios en Puerto Rico no menoscaba ninguna obligación contractual y es constitucional.

2. BANCOS Y OPERACIONES BANCARIAS—''CONTROL'' Y REGLAMENTACIÓN EN GENERAL—PODER O FACULTAD DEL ESTADO PARA REGLAMENTARLOS.—En relación con el negocio de banca, el Estado tiene poder, por la naturaleza pública de aquél, no sólo para reglamentarlo sino que también para prohibirlo cuando no se cumplen los requisitos estatutorios.

3. DERECHO CONSTITUCIONAL—OBLIGACIONES DE LOS CONTRATOS—CONTRATOS DEL ESTADO Y MUNICIPALIDADES—RESERVA DE DERECHOS PARA MODIFICAR O ALTERAR LAS CARTAS CONSTITUTIVAS DE ENTIDADES.—La naturaleza pública del negocio de banca equivale a una reserva implícita por parte del Estado del poder que tiene para reglamentarlo modificando sus estatutos.

4. CORPORACIONES—REINCORPORACIÓN Y REORGANIZACIÓN—REINCORPORACIÓN BAJO NUEVOS ESTATUTOS—EN GENERAL — SOCIEDADES ANÓNIMAS ORGANIZADAS Y CONSTITUÍDAS BAJO EL CÓDIGO DE COMERCIO.—Organizada y constituída una sociedad anónima dedicada a operaciones de banca de acuerdo con el Código de Comercio, dicha sociedad, al dar cumplimiento a la sección 4 transitoria de la Ley No. 18 de 1923 (2) p. 85 no cambia su personalidad ni se convierte en un banco de nueva creación al que tenga que hacer dicha sociedad un traspaso de sus acciones y propiedades, sin que para ello se requiera el consentimiento unánime de los accionistas.

5. CORPORACIONES—REINCORPORACIÓN Y REORGANIZACIÓN—ACUERDOS RELATIVOS A LA REINCORPORACIÓN—VALIDEZ DE LOS MISMOS.—Cuando los estatutos por los cuales se rige una sociedad anónima dedicada al negocio privado de banca faculta a sus accionistas para modificar aquéllos, el acuerdo de los accionistas acordando la incorporación de dicha sociedad es válido especialmente cuando las cláusulas de incorporación están de acuerdo con su modo de funcionar y no varían su naturaleza.

6. ESTATUTOS—ASUNTOS Y TÍTULOS DE LAS LEYES—EXPRESIÓN DEL ASUNTO DE LA LEY EN EL TÍTULO—ASUNTO INCLUÍDO EN LA LEY NO EXPRESADO EN EL TÍTULO—DISPOSICIONES INHERENTES AL, RELACIONADAS O AFINES CON, O AUXILIARES DEL TÍTULO.—Siendo la Ley No. 18 de 1923 (2) p. 83 de carácter uniforme para poner bajo una misma reglamentación a todo banco de nueva o antigua creación que como tal funcione en la Isla, la disposición 4 de dicha Ley haciendo a ésta extensiva a los bancos existentes está incluída en el título de aquélla.

SENTENCIA de *M. Rodríguez Serra,* J. (San Juan, Segundo Distrito), declarando con lugar la demanda en el primer caso y nulo y sin valor alguno el acuerdo disponiendo la incorporación del Banco demandado, con costas; y declarando sin lugar las peticiones de *injunction* en los otros dos casos, sin costas. *Revocadas* las sentencias en los dos primeros casos y *Confirmada* la dictada en el último.

*Juan de Guzmán Benítez,* abogado del Banco apelante en los dos dos primeros casos; *Jaime Sifre, Jr., Horacio Franceschi* y *Diego O. Marrero,* abogados de las apelantes en el tercero; *F. Soto Gras,* abogado de los apelados en el primer caso y como *amicus curiae,* en los otros dos; *Jaime Sifre, Jr., Horacio Franceschi* y *Diego O. Marrero,* abogados de los apelados en el segundo caso y *Juan*

*de Guzmán Benítez,* abogado del Banco apelado en el tercero; *Hon. Attorney General George C. Butte,* abogado de los demandados Hons. Tesorero y Secretario Ejecutivo de Puerto Rico, en los dos últimos.

EL JUEZ ASOCIADO SEÑOR FRANCO SOTO, emitió la opinión del tribunal.

En todos estos casos se discute la validez de cierto acuerdo tomado por la junta general de accionistas del banco demandado con el propósito de incorporarse de acuerdo con lo que dispone la Ley No. 18 ''Reglamentando los bancos y las operaciones bancarias en Puerto Rico,'' aprobada en septiembre 10, 1923.

En el caso No. 3805 se pedía por los demandantes como accionistas del banco demandado la nulidad de dicho acuerdo y la corte inferior dictó sentencia accediendo a lo solicitado. De esta sentencia se apeló por el banco demandado.

En el caso No. 3804 los demandantes, también accionistas del banco, establecieron demanda con el mismo objeto pero además interesaban que se expidiera un *injunction* perpetuo para que la demandada, sus agentes y empleados se abstuvieran de realizar acto alguno tendiente a la incorporación del Banco Territorial y Agrícola bajo los preceptos de la Ley No. 18 antes mencionada. En este caso la corte inferior declaró sin lugar la petición de *injunction* y se abstuvo de hacer pronunciamiento alguno por lo que toca a la legalidad del acuerdo del banco por haberlo hecho en el caso No. 3805. De la sentencia se apeló por una y otra parte.

La Legislatura de Puerto Rico aprobó en septiembre 10, 1923, la ley citada No. 18, cuyo título, así como los preceptos pertinentes, en relación con estos pleitos, leen como sigue:

''Ley reglamentando los bancos y las operaciones bancarias en Puerto Rico.

''Sección 1.—Esta Ley se denominará 'Ley de Bancos' y se aplicará a todas las corporaciones ya organizadas y que se organicen en

el futuro para dedicarse al negocio de banca en Puerto Rico; *Disponiéndose,* que el término 'banco' en la definición de un negocio sólo lo podrán usar las corporaciones que hiciesen exclusivamente el negocio de banca.

"Sección 2.—Para que un banco se dedique al negocio de banca en la Isla de Puerto Rico se requiere llenar previamente los requisitos que determina esta Ley, y su ejercicio sin haberlos llenado será penado en la forma que más adelante se expresará.

"Sección 4.—Cinco o más personas con capacidad legal suficiente, podrán organizar un banco, otorgando ante notario y archivando, en duplicado, cláusulas de incorporación de acuerdo con las disposiciones de esta sección; *Disponiéndose, no obstante,* que los bancos que actualmente estuvieren haciendo negocios en Puerto Rico, podrán continuar tales negocios en Puerto Rico, aun cuando hayan sido organizados como corporaciones con menos de cinco incorporadores, siempre que se sujeten a las demás disposiciones de esta Ley; *Disponiéndose, además,* que los bancos que estuvieren haciendo negocios en Puerto Rico, y que no hayan sido incorporados, deberán incorporarse de acuerdo con las disposiciones de esta Ley, dentro de un plazo de seis meses contados desde la fecha en que la ley empiece a regir.

"Dichas cláusulas de incorporación *deberán firmarse por cada uno de los incorporadores y jurarse en debida forma ante un notario público.* Se hará constar en ellas específicamente:

"(a) Nombre que haya de llevar el banco;

"(b) Ciudad, o pueblo de Puerto Rico, y calle y número, si lo hubiere, en que haya de establecerse su oficina principal, que será su domicilio legal;

"(c) Montante de su capital autorizado, número de acciones en que esté representado, valor a la par de cada una de éstas, y, si han de emitirse en series, la fecha de emisión de cada serie; así como la forma y plazos en que hayan de ser pagadas;

"(d) Término fijado para la duración del banco;

"(e) Operaciones a que destine preferentemente su capital;

"(f) Plazos y forma de convocación y celebración de las juntas generales ordinarias de accionistas, y las razones, casos y modos·de convocar y celebrar las extraordinarias;

"(g) Modo de contar y constituirse la mayoría así en las juntas ·ordinarias como en las extraordinarias; siempre que no se oponga a lo dispuesto en esta Ley;

"(h) Nombres y residencias de los incorporadores y número de acciones suscritas por cada uno de ellos;

"(i) Número de directores del banco, que no será menos de cinco; y que deberán ser residentes *bona fide* de Puerto Rico; forma de elegirlos, tiempo que desempeñarán el cargo, y número necesario para constituir *quorum;*

"(j) Cualquiera otra cláusula que los incorporadores juzguen conveniente insertar para regular los negocios y manejar los asuntos del banco, siempre que dichas cláusulas no se opusieren a esta Ley, o cualesquiera otras leyes de Puerto Rico.

"Sección 5.—Una vez firmadas y juradas las cláusulas de incorporación según se dispone anteriormente y presentadas las dos copias de la misma al Secretario Ejecutivo de Puerto Rico, y previo el pago de los derechos correspondientes, al expedirse por el Secretario Ejecutivo de Puerto Rico, bajo su sello, la certificación de que dicho documento, conteniendo las cláusulas exigidas en la sección anterior, queda archivado en su oficina, principiará la existencia del banco que en dichas cláusulas se nombra, y a partir de la fecha de tal archivo constituirá persona jurídica el banco de referencia, con el nombre que en dichas cláusulas consta, con sujeción, no obstante, a su disolución según lo dispuesto en otra parte de esta Ley.

"Librada que fuere la certificación por el Secretario Ejecutivo de Puerto Rico, según se dispone anteriormente, lo notificará al Tesorero de Puerto Rico, enviándole al mismo tiempo el duplicado de las cláusulas de incorporación.

"Las cláusulas de incorporación archivadas de acuerdo con esta Ley, o una copia de las mismas debidamente legalizada por el Secretario Ejecutivo de Puerto Rico, constituirá prueba, *prima facie,* de los hechos consignados en ellas."

\*    \*    \*    \*    \*    \*    \*

En julio 21, 1894, se organizó y constituyó por escritura pública, siguiendo las disposiciones del Código de Comercio, la sociedad anónima "Banco Territorial y Agrícola de Puerto Rico," aprobándose sus Estatutos de acuerdo con dicha escritura de constitución y por los cuales ha venido rigiéndose desde su fundación, salvo algunas modificaciones no sustanciales hechas posteriormente, determinándose en dichos estatutos las facultades, así como las operaciones a que se dedica, y consignándose en ellos, entre otros extremos, los siguientes:

"Art. 1º.—En armonía con lo prevenido en el Código de Comer-

cio, se establece una Sociedad Anónima titulada Banco Territorial y Agrícola de Puerto Rico, cuya duración será de 75 años.''

*    *    *    *    *    *    *

''Art. 3⁰.—El propósito del Banco es auxiliar a los propietarios, arrendatarios y aparceros para favorecer especialmente el desarrollo de la agricultura y la perfección de las industrias que con ella se rozan, con cuyo objeto efectuará las operaciones siguientes:

''Primera: Prestar con hipotecas sobre fincas rústicas y urbanas.

''Segunda: Adquirir créditos hipotecarios sobre las propias fincas.

''Tercera: Emitir cédulas hipotecarias y obligaciones al portador, conforme a los artículos 176 y 199 del Código de Comercio.

''Cuarta: Hacer toda clase de préstamos en metálico o valores equivalentes, sobre frutos pendientes o almacenados, ganado, u otra prenda o garantía personal o colateral que sea eficaz.

''Quinta: Garantizar con su firma pagarés y efectos. exigibles al plazo máximo de noventa días, para facilitar su descuento o negociación a los propietarios y cultivadores.

''El Banco podrá además con la mira de atender más ampliamente a sus fines principales:

''(a) Recibir fondos en depósito con interés o sin él.

''(b) Abrir cuentas corrientes y efectuar pagos hasta el total de la cantidad consignada en esa forma.

''(c) Verificar todas las operaciones a que están autorizadas las sociedades de crédito en general, y en particular las agrícolas y de crédito territorial.''

*    *    *    *    *    *    *

''Art. 75.—Siempre que haya de ocuparse la junta general, ora sea ordinaria o extraordinaria, del aumento o disminución del capital social, de la reforma de .estos Estatutos o de la modificación o disolución de la Sociedad, se hará expresa mención de estos asuntos en la convocatoria y será indispensable para tomar acuerdos válidos, que concurran a la Junta las dos terceras partes de los accionistas, representando las dos terceras partes del valor nominal de las acciones emitidas.''

*    *    *    *    *    *    *

''Art. 84.—Son de la exclusiva competencia de la Junta general los asuntos siguientes:

*    *    *    *    *    *    *

''6⁰.—Aprobar o modificar asimismo los demás Reglamentos del Banco y acordar lo que juzgue procedente sobre la reforma o varia-

ción de sus Estatutos, el aumento o disminución del capital social y
la liquidación y disolución de la Sociedad, si bien para ocuparse en
estos últimos asuntos deberán llenarse todos los requisitos prescritos
en el artículo 75.''

En mayo 19, 1924, la junta general de accionistas, en
sesión extraordinaria, aprobó un acuerdo determinando la
inscripción del banco demandado para dar cumplimiento a
la sección 4 de la Ley No. 18, reglamentando los bancos, etc.

En la convocatoria para la celebración de dicha junta
extraordinaria se hizo expresa mención de que era su ob-
jeto la incorporación del banco y la de aprobar las cláusu-
las de incorporación. Concurrieron 32 personas represen-
tando 313 accionistas con 10,561 acciones. El número de
acciones emitidas era 12,000 y el número total de accionis-
tas 393. De manera que concurrieron a la junta más de las
dos terceras partes de los accionistas, representando más
de las dos terceras partes de las acciones del capital, que-
dando así constituída según exige el artículo 75 de los Es-
tatutos antes citados.

La proposición que fué adoptada por el voto de 24 con-
currentes representando 292 accionistas con 9,178 acciones,
votando en contra 8 representando 21 accionistas con 1,383
acciones, en parte, es como sigue:

''Por cuanto: La Ley de Bancos vigente en Puerto Rico apro-
bada con número diez y ocho y fecha diez de septiembre de mil no-
vecientos veinte y tres y que empezó a regir noventa días después
de su aprobación, dispone en su sección cuarta que los bancos que
estuvieren haciendo negocios en Puerto Rico y que no hayan sido
incorporados deberán incorporarse de acuerdo con las disposiciones
de dicha ley, dentro de un plazo de seis meses contados desde la fe-
cha en que la ley empieza a regir;

''Por cuanto: La Administración del Banco citó a la Junta Ge-
neral de accionistas en sesión extraordinaria que tuvo lugar el día
veinticuatro de marzo de mil novecientos veinte y cuatro concu-
rriendo más de las dos terceras partes de acciones y de accionistas,
para someterles la cuestión de si debe o no incorporarse el banco y
como consecuencia de las deliberaciones de dicha Junta General se

acordó declarar que es el deseo de la Junta cumplir dicha ley de incorporaciones y seguir la marcha de las demás corporaciones bancarias; pero habiéndose mostrado oposición por una minoría de acciones y accionistas, y habiéndose suscitado controversias sobre la posibilidad de que el banco se incorpore sin variar su personalidad, se resolvió dejar pendiente el asunto encargando al Concejo de Administración que gestione ante las autoridades y oficiales del Gobierno la forma de hacer dicha incorporación de acuerdo con la ley y que en caso de que hubiere necesidad de tomar alguna otra resolución definitiva para llevar a efecto la incorporación, se diera cuenta a la Junta General;

''Por cuanto: El Consejo de Administración del Banco informa que habiendo realizado las gestiones que se le encomendaron, ante el Tesorero y Secretario Ejecutivo y el Attorney General de Puerto Rico ha obtenido de esos funcionarios la información de que el banco debe cumplir con dicha ley, incorporándose, pero que a ellos no corresponde informar sobre la manera como el banco deba hacerlo, por lo que subsiste siempre la necesidad urgente de tomar una determinación en el asunto;

''Por cuanto: Con este motivo el Consejo de Administración del Banco ha convocado a la presente Junta General de Accionistas a la que también han concurrido más de las dos terceras partes de acciones y de accionistas, sometiendo la anterior información así como un proyecto de incorporación del banco sin variar su personalidad y por medio de varios incorporadores designados por esta Junta General previa aprobación por la misma de las cláusulas de incorporación;

''Por cuanto: Un procedimiento análogo ha sido ya usado por las sociedades bancarias que al igual que esta sociedad estaban creadas con arreglo al Código de Comercio y se han incorporado registrando sus cláusulas en la Secretaría de Puerto Rico, como son el 'Banco Popular de Economías y Préstamos de San Juan, P. R.' y la 'Caja de Economías y Préstamos de Cabo Rojo, P. R.;'

''Por cuanto: Discutido convenientemente este asunto, la Junta General ha resuelto cumplir con dicha ley de bancos siempre que ello no determine la necesidad de cambiar la entidad bancaria sino que por el contrario como dice la ley continúa este banco haciendo negocios en la misma forma que hasta el presente;

''Por tanto: La Junta General acuerda:

''1ro. Que se lleve a efecto la incorporación de este Banco Territorial y Agrícola de Puerto Rico bajo las cláusulas de incorporación aprobadas por esta Junta General y que dicen:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

El juez inferior en su razonamiento para sostener la nulidad de este acuerdo endosado por la mayoría de accionistas, en parte se expresa así:

"El Banco demandado es una Sociedad anónima constituída en 1894 de acuerdo con las disposiciones del Libro Segundo, Artículo Primero, Secciones 1ra. y 4ta. del Código de Comercio entonces y hoy vigentes.

❋    ❋    ❋    ❋    ❋    ❋    ❋

"Si se tratase solamente de disolver la Sociedad anónima para crear una corporación, no hay duda de que la mayoría estaría facultada para acordarlo y sería lícito que un número determinado de los antiguos accionistas suscribiesen las cláusulas de incorporación y dieran vida a la nueva entidad.  Pero la situación es distinta en este caso.  Se desprende de las cláusulas de incorporación antes insertas, que el capital de la nueva corporación estará constituído por el de la antigua sociedad, y que los accionistas de ésta se convierten (algunos de ellos, contra su voluntad) en accionistas del banco.  Y de aquí surge la gravedad e importancia del problema a resolver.

❋    ❋    ❋    ❋    ❋    ❋    ❋

"¿Pero alcanza tal poder de los socios de la mayoría hasta obligar a los de la minoría, además de dar por terminada la existencia de la entidad de que forman parte, a constituir una nueva entidad y a contribuir a su capital con el importe de sus haberes en la extinguida?

❋    ❋    ❋    ❋    ❋    ❋    ❋

". . . . La conversión automática de una sociedad anónima constituída bajo las disposiciones del Código de Comercio, en una corporación de acuerdo con la Ley Especial de Bancos de 1923, no puede considerarse como simple modificación, como mero cambio de apariencia, forma o externa vestimenta.  Ella implica, necesariamente, la terminación de la vida de la entidad anterior.

"Si por voluntad de la mayoría puede disolverse una sociedad anónima, no puede ir más lejos y convertirse en corporación, e investir, con el carácter de accionistas de ésta, a los antiguos socios de aquélla contra la voluntad expresa de ellos.  Ni mucho menos disponer de los haberes de la primera para formar el capital de la segunda.

"La Sociedad anónima nace a virtud de un contrato privado entre partes, cuyas bases, pactos o condiciones esenciales se hacen cons-

tar en escritura pública, y se inscriben en el Registro Mercantil. Hecho esto, surge a la vida la persona jurídica así creada. Todo pacto esencial que se varíe, debe hacerse constar en escritura e inscribirse también en el Registro Mercantil.

"La Corporación supone otras formalidades esencialmente diferentes. Unos incorporadores la crean, con la imprescindible sumisión a la autoridad legislativa. Ello supone un contrato en que interviene el Estado como parte para autorizarla, para modificar o alterar sus pactos, y para terminar la vida, por causas apropiadas.

✳        ✳        ✳        ✳        ✳        ✳        ✳

"Pero el hecho de haber presentado en la Secretaría de Puerto Rico, las Cláusulas de Incorporación y el de no adoptar, ninguna cláusula o disposición explícita reconociendo la obligación de liquidar, y por el contrario, oponerse, expresamente, en las argumentaciones en este caso por medio de su abogado, al proceso de liquidación, nos lleva forzosamente a la conclusión de que lo que se ha hecho y se pretende hacer es transferir al nuevo Banco todas las propiedades del antiguo, prescindiendo del asentimiento de algunos de los accionistas, y obligar a éstos, contra su voluntad, a que acepten una novación de su contrato y asuman nuevas obligaciones que no desean contraer.

✳        ✳        ✳        ✳        ✳        ✳        ✳

"Además, la incorporación del Banco altera fundamentalmente el contrato social anterior, por cuanto en virtud del último párrafo de la Sección 35, la ley especial de bancos citada, en relación con las de la Sec. 5ª de la ley de 9 de mayo de 1911, y sus enmendatorias posteriores, el Banco demandado se transforma en una entidad corporativa sujeta a ser disuelta a voluntad por la Asamblea Legislativa, que puede, además, alterar, suspender o revocar las cláusulas de incorporación o sus enmiendas. Tal cambio o transmutación afecta esencialmente la índole o naturaleza de la persona jurídica demandada, y no puede hacerse sin el asentimiento unánime de los accionistas."

El mismo juez inferior en sus conclusiones denegando la petición de *injunction,* razona así:

"Después de estudiar detenidamente los alegatos presentados por los abogados de las partes, llegamos a las siguientes conclusiones:

"1ra.   El Banco es una sociedad anónima organizada de acuerdo con las disposiciones del Código de Comercio. No puede conside-

rársele como corporación a los efectos de la Ley de Bancos.   Tampoco puede reorganizarse, variando su constitución, sin el unánime consentimiento de todos sus accionistas.   Estas partes de la controversia fueron tratadas con la amplitud conveniente en la opinión que escribimos en el caso de Dionisio Trigo y otros contra el Banco Territorial y Agrícola de Puerto Rico, Civil No. 720, en el que se dictó sentencia el día 27 de Marzo de 1925.

"2da.   El Banco debe modificar su presente organización y constituirse según requieren las disposiciones de la Ley de Bancos vigente.   Esta ley, como la parte actora reconoce, contiene una reglamentación razonable y está sostenida por la doctrina del 'Police Power.'   Las disposiciones de su Sección 4ta. no son nulas, porque impongan a los bancos ya existentes la obligación de incorporarse.

"El Gobierno Insular, representante del Estado, tiene el derecho de fiscalizar y reglamentar los negocios de este Banco, y de cualesquiera otros existentes ahora o que se establezcan en lo porvenir. Y no aquello sólo que se refiera a inspección o reglamentación, sino lo que concierne a la organización fundamental de cualquier banco, está basado en la doctrina del 'Police Power' (facultad directiva, política, pública, poder policíaco) porque el negocio bancario es ahora, y ha sido, desde hace tiempo, considerado por los más altos tribunales de los Estados Unidos como un negocio de naturaleza cuasi pública.

*          *          *          *          *          *          *

"El argumento de que las exigencias de la ley en cuestión implican la destrucción absoluta y completa de un negocio establecido bajo el amparo de otra ley, carece de base.   No se destruye negocio alguno; se exige, sólo, una organización uniforme que permita al gobierno intervenir más adecuada y eficazmente en el negocio bancario, cuya creciente importancia en la vida económica es innegable. Para el cumplimiento del fin apetecido, creyó necesario el legislador que estén incorporadas las entidades dedicadas al negocio de banca. No lo impide, ni lo obstaculiza; prescribe la forma de realizarlo.

"No merma esa ley los derechos de propiedad protegidos por el artículo VIII del Tratado de París.   No se dice en la demanda, ni se ha probado en forma alguna, cuáles sean los derechos de propiedad vulnerados, al exigirse al Banco el cumplimiento de la sección 4ta. de la ley.

"Se alega que el Banco estaba constituído de acuerdo con las disposiciones del Código de Comercio y que su período de duración, 75 años, no ha terminado y que, por no consentir la ley al banco el

ejercicio del negocio en otra forma distinta de la corporativa se ha violado el derecho de usar aquella forma de organización. Pero ¿es un derecho de propiedad lo que únicamente calificarse puede como permiso para adoptar una forma de asociación? Y si se invoca la protección garantida por el Artículo VIII del Tratado de París, deberá también recordarse que el IX reconoce a los súbditos españoles residentes en los Territorios cuya soberanía española, renunciaba o cedía, el derecho de ejercitar su industria, comercio o profesión, 'sujetándose a este respecto a las leyes que sean aplicables a los demás extranjeros.'

·''Es incuestionable que el 'Police Power' del Gobierno de los Estados Unidos en Puerto Rico o del Pueblo de Puerto Rico no puede subordinarse ni está limitado o restringido por el Tratado o por el acto mismo de la adquisición del territorio.

❋  ❋  ❋  ❋  ❋  ❋  ❋

''Como antes dijimos, el negocio de Banca es asunto o materia propio de ordenamiento legislativo, en virtud del poder policíaco del Estado, y por su naturaleza y relación con la vida del público y los recursos del Estado, puede tal facultad extenderse aun hasta prohibir empresas bancarias que no se ajusten a las condiciones que requiriese.

❋  ❋  ❋  ❋  ❋  ❋  ❋

''El libre ejercicio del negocio bancario pudiera acarrear peligros para el público, y a fin de prevenirlos, las legislaturas de los estados han decidido someterlo a un régimen de vigilancia, que puede llegar en ciertas circunstancias hasta el límite de la prohibición.

❋  ❋  ❋  ❋  ❋  ❋  ❋

''La alegación de que parte de la ley que nos ocupa no es constitucional porque las disposiciones que afectan al Banco y exigen su incorporación no están incluídas en el título, tampoco es de gran fuerza.

❋  ❋  ❋  ❋  ❋  ❋  ❋

''. . . . No es necesario entrar en laboriosos razonamientos para decidir que la disposición de que se organicen como corporaciones todas las entidades bancarias de la Isla, es congruente con el título y está en él comprendido.''

Salta a la vista cierta inconsistencia entre estos últimos fundamentos y aquellos que sirvieron de base para declarar

· la nulidad del acuerdo de mayo 19, 1924. Nada más aparente la contradicción, pues parece ilógico que se mantenga la debida aplicación de la Ley No. 18 sobre la reglamentación de los bancos a los ya existentes, así como la constitucionalidad de la misma, y se declara a la vez la nulidad de aquel acuerdo que envuelve la incorporación del banco demandado en cumplimiento de dicha ley. Por lo menos el razonamiento del juez inferior sosteniendo la bondad y aplicación de la ley a los bancos existentes al tiempo de su promulgación, parece más en armonía con el espíritu general de tratadistas y autoridades interpretando una legislación más avanzada y protectora de la seguridad pública.

La teoría de los demandantes, accionistas en minoría, que no estuvieron conformes con el acuerdo de la incorporación, parte del principio de que siendo el banco demandado una sociedad anónima, organizada de acuerdo con el Código de Comercio, la corporación cambia su personalidad y lo convierte en un banco distinto de nueva creación al que tiene que hacer la demandada un traspaso de sus acciones y propiedades, todo lo cual, alegan, que no puede hacerse sin el consentimiento unánime de todos los accionistas.

Hay, sin embargo, una marcada diferencia entre los demandantes en su argumentación para establecer su tesis. Mientras los abogados de Camblor *et al.* sostienen que las sociedades anónimas que describe el Código de Comercio son verdaderas corporaciones, por lo cual no tienen necesidad de incorporarse, los de Trigo *et al.* alegan que aquellas sociedades por su naturaleza no pueden considerarse como tales corporaciones, asemejándose más bien a las que dentro de la legislación americana se conocen con el nombre de Joint Stock Company (*Partnership*).

[1] El Código de Comercio español que empezó a regir en Puerto Rico en primero de mayo de 1886 es el que regula las sociedades mercantiles, entre éstas las anónimas, y si bien es uno de los códigos que no ha sido objeto de revisión

por nuestra legislatura, es incuestionable que por el mero
cambio de soberanía algunos de sus preceptos quedaron de-
rogados (las disposiciones sobre quiebras, por ejemplo),
quedando en general sujeto a ser interpretado en armonía
con la legislación nacional o local que pudiera afectarlo.
Así en el caso de *Martínez* v. *La Asociación de Señoras Da-
mas del Santo Asilo de Ponce*, 213 U. S. 20, refiriéndose a
las asociaciones organizadas bajo el régimen español, se de-
claró que tales asociaciones bajo la presente soberanía se
habían convertido en corporaciones portorriqueñas, y en lo
pertinente a estos pleitos, después de un análisis de las dis-
posiciones del Acta Orgánica de abril 12, 1900, estable-
ciendo un gobierno civil en Puerto Rico, la corte dijo:

"En la forma de gobierno típicamente americano la creación y
el dominio de las corporaciones es una función exclusivamente le-
gislativa.   Somos de opinión que el efecto de la ley orgánica es re-
vestir en el gobierno de Puerto Rico esta función, en lo que se re-
fiere a una corporación de la clase que estamos considerando, cuyos
requisitos esenciales no es necesario repetir; y que tal corporación
es ahora, al ser ciudadana de algún país, ciudadana de Puerto Rico.
No necesitamos considerar ahora si la corporación tiene una existen-
cia más que *de facto,* sujeta a la voluntad de la legislatura de Puerto
Rico.''

Todas las cuestiones, por consiguiente, que se refieren a
la naturaleza de las sociedades anónimas, a su carácter pri-
vado contractual entre los accionistas y el banco deman-
dado, alegándose por tal razón que no se le puede obligar
al banco demandado a incorporarse porque sería convertirlo
en una corporación, las que por ser criaturas del Estado
quedaban sujetas a su disolución y liquidación, destruyendo
este cambio derechos adquiridos por el banco y sus accionis-
tas durante la soberanía española y protegidos por el Tra-
tado de París que dió fin a la guerra de España y Estados
Unidos, no tienen la importancia que se les ha dado bajo
las circunstancias de estos casos.   Aun teóricamente es más
exacto decir que las corporaciones, del mismo modo que las

llamadas sociedades anónimas, son actualmente creaciones
de la ley.   La historia de la legislación demuestra que al
principio ellas nacían mediante privilegio de los Reyes;
más tarde por concesión de los gobiernos y en los tiempos
modernos por creación de la ley.   Los cambios han ido al
compás del progreso de los sistemas de gobierno.   Dentro
de la autorización de la ley, las instituciones bancarias eran
creadas por actos especiales.   Pero a causa de los peligros
resultantes del poder inherente de las legislaturas para ha-
cerlo así por actos especiales, disposiciones constitucionales
han sido adoptadas restringiendo tal poder.   Actualmente
una corporación bancaria usualmente es creada bajo leyes
generales, las que junto con los artículos de incorporación
constituyen su carta.   3 R.C.L. 384.   Esta forma de organi-
zación por una ley general se estableció en España para las
sociedades anónimas por el Código de Comercio de 1829 y
así también se establece en el actual Código de 1885 que
uniformó y recopiló la legislación de las diversas sociedades
anónimas que estuvo hasta entonces vigente por leyes y rea-
les decretos especiales, como veremos más adelante.

Trátese, no obstante, de una u otra legislación creando
respectivamente las corporaciones o las sociedades anónimas,
no se desconoce por la ley el carácter contractual en su or-
ganización y los accionistas con derecho a ser protegidos
por la cláusula de la Constitución Federal que prohibe a los
estados decretar leyes que destruyan obligaciones contrac-
tuales.   En esto insisten vigorosamente todos los demandan-
tes, pero la ley de 1923 reglamentando los bancos no tiene
ese efecto en ninguna de sus disposiciones.   No se menosca-
ban los derechos de los accionistas del banco demandado,
sino que por el contrario se garantizan, así como los del
público en general, mediante la reglamentación razonable
que establece dicha ley.   Desde que los bancos se han con-
vertido en verdaderas arterias por donde circula la riqueza
y en factores o agencias indispensables fomentando las fuen-

tes de la vida económica: la industria, el comercio y la agricultura, sus operaciones, aunque tengan por objeto un beneficio privado, se les considera de índole pública y unánimemente se les ha reconocido como materia propia de reglamentación legislativa bajo el poder de policía de los estados (*police power*).

En cuanto a este poder inherente en los estados, las autoridades dicen lo siguiente:

"La enmienda catorce a la Constitución de los Estados Unidos no interviene con el debido ejercicio del poder de policía de los distintos estados. De conformidad, las disposiciones de esta enmienda que prohiben que un estado prive a una persona de la vida, libertad o propiedad sin el debido proceso de ley, no equivale a una limitación del poder de policía del estado a aprobar o hacer cumplir tales leyes que, a su juicio, redundaran en beneficio de la salud, la moral y bienestar del pueblo; ni impiden que se prohiba legislación con el fin de regular ocupaciones útiles que a causa de su naturaleza o sitio puedan resultar perjudiciales u ofensivas al público." 6 R. C.L. 197-8.

"Aunque según la ley común el negocio de banca se consideraba como una de las ocupaciones legales a la cual se podían dedicar los ciudadanos, es generalmente reconocido que el negocio de banca es de tal carácter que justifica a la legislatura, en el ejercicio de su poder de policía, a imponer reglamentaciones razonables sobre la forma y modo en que debe ser administrado." 6 R.C.L. 220.

[2] Entre los casos que se citan en la nota No. 13 de 6 R.C.L. 220, sosteniendo estos principios, se encuentra el de *Noble State Bank* v. *Haskell*, 219 U. S. 104. Aunque en este caso solamente se trata de un *injunction* para impedir el pago de una contribución tendiente a crear un fondo para garantizar a los depositantes de dinero en los bancos, se le dió tal alcance al poder de los estados en relación con los negocios de banca, no ya únicamente en sentido de su reglamentación sino hasta el punto de prohibirlo cuando no se cumplen los requisitos exigidos por la ley. A este efecto la Corte Suprema por voz del Juez Asociado Sr. Holmes dijo así:

"No se aclara suficientemente la cuestión que hemos decidido al investigar si el derecho de dedicarse a la banca es o puede ser objeto de una franquicia. Pero como esta última cuestión tiene alguna relación con la primera, y como tiene que ser tomada en consideración en los casos siguientes, tal vez en este mismo, la resolveremos ahora.

"La misma no queda resuelta citando autoridades sobre la existencia de tal derecho según la ley común. Hay muchas cosas que podría hacer un hombre dentro de la ley común que el estado puede prohibir. El puede malversar fondos públicos hasta que un estatuto le prive de su libertad. No podemos decir que los intereses públicos a que nos hemos referido, así como otros, no sean suficientes para dar derecho al estado a tomar el negocio de la banca bajo su dominio. Por el contrario, somos de opinión que no tan sólo puede regularse, sino que también prohibirse, cuando no se cumplan los requisitos de ley. En resumen, si la Legislatura de Oklahoma declara implícitamente que el dedicarse libremente a la banca es un peligro público, y que la incorporación, la inspección, y la anteriormente mencionada cooperación son salvaguardias necesarias, esta córte no puede decir que tal proceder sea erróneo. North Dakota v. Woodmansee, 1 N. Dak. 246. Brady v. Mattern, 125 Iowa 158, Weed v. Bargh, 141 Wisconsin 569, Commonwealth v. Wrrooman, 164 Pa. 306. Myers v. Irwin, 2 S. & R. 368. Myers v. Manhattan Bank, 20 Ohio 283, 302. Attorney General v. Utica Insurance Co., 2 Johns Ch. 371, 377."

Este caso que resolvió que el negocio de banca puede limitarse a las corporaciones, puso término a las extensas discusiones que venían sosteniéndose en los diferentes estados sobre leyes que en tal sentido reglamentaban las operaciones bancarias y a él han seguido decisiones posteriores de la misma Corte Suprema de los Estados Unidos, de las que podemos citar: *Shallenberger* v. *Holstein First State Bank,* 291 U. S. 114, 31 S. Ct. 189, 55 U. S. (L. ed.) 117; *Assaria State Bank* v. *Dalley,* 219 U. S. 121, 31 S. Ct. 189, 55 U. S. (L. ed.) 123; *Engel* v. *O'Malley,* 219 U. S. 128, 31 S. Ct. 190, 55 U. S. (L. ed.) 128.

Uno de los casos que por la fuerza convincente del razonamiento es importante mencionar, limitando el negocio de banca a la forma corporativa, es el de *Weed* v. *Bergh,* 141

Wis. 569, 124 N. W. 664, 25 L.R.A. (N. S.) 1217. La Corte Suprema de Wisconsin dice así:

"Si se admite que los bancos privados pueden estar sujetos a todas las disposiciones en lo que respecta a visitas, inspecciones y exámenes y la rendición de informes hasta el mismo alcance que las corporaciones, sin embargo, debe convenirse en que hay por lo menos dos peligros bien definidos para el público que están presentes, y deberían estarlo, en el negocio de los bancos privados, peligros que quedan eliminados por las corporaciones bancarias. El primero de éstos es el peligro de que el banquero particular, dedicándose a aventuras comerciales fuera de su negocio, puede comprometer su capital bancario con las reclamaciones de sus acreedores comerciales, perjudicando así grandemente, si no destruyendo, los remedios de los depositantes bancarios; y, el segundo es el peligro y el inconveniente que probablemente resultaría cuando muere un banquero privado y el negocio tiene que paralizarse temporalmente hasta que se tramite su testamentaría, lo que implica tal vez la destrucción de la confianza pública y el asedio de la institución por los imponedores. Estos peligros son bastante reales y graves y quedarían eliminados eficazmente tratándose de una corporación cuyos negocios se limiten estrictamente al de la banca, y que no muere. No puede decirse que podrían encontrarse posibles remedios para afrontar estos peligros inherentes que surgen de la banca privada mediante otras formas de reglamentación, aunque estamos inclinados a creer que esto sería muy difícil de realizar sin infringir algunas de las garantías constitucionales de los derechos del ciudadano. Si en realidad el requisito de la incorporación es una forma de reglamentación calculada razonablemente para afrontar y remediar estas dificultades, aunque no en la forma más sabia, debe resolverse que se hace en el ejercicio del poder de policía."

[3] Los abogados de Camblor citan a su vez el caso de *Noble State Bank* v. *Haskell, supra,* para sostener que aunque no se menoscababa ninguna obligación contractual, la Corte Suprema encontró que el Estado se había reservado el derecho de modificar y alterar la carta constitutiva. Parece que a esta cuestión de reserva por el Estado para modificar o alterar las corporaciones se le da por los demandantes una importancia predominante y se sostiene que en el Código de Comercio que autoriza la constitución de las

sociedades anónimas, el gobierno español no hizo reserva de modificar o alterar la carta constitutiva de tales entidades.

Aparte de lo que ya hemos dicho refiriéndonos al caso de *Martínez* v. *Asociación de Señoras Damas del Santo Asilo de Ponce, supra,* las corporaciones en que el Estado autoriza su constitución por una ley general, usualmente los estatutos prescriben la manera en que los artículos de incorporación pueden ser enmendados por los accionistas. 7 R.C.L. 112. Y esto también era lo usual en la organización de las Sociedades Anónimas (artículos 75 y 84 de los estatutos del banco demandado, *supra,* y no previsto el caso, el Código de Comercio contenía las prescripciones supletorias para hacer la modificación de sus estatutos.

El art. 168 del Código de Comercio prescribe:

"Las sociedades anónimas reunidas en junta general de accionistas previamente convocada al efecto, tendrán la facultad de acordar la reducción o. el aumento del capital social.

"En ningún caso podrán tomarse estos acuerdos en las juntas ordinarias, si en la convocatoria o con la debida anticipación no se hubiese anunciado que se discutiría y votaría sobre el aumento o reducción del capital.

"Los estatutos de cada compañía determinarán el número de socios y participación de capital que habrá de concurrir a las juntas en que se reduzca o aumente, o en que se trate de la modificación o disolución de la sociedad.

"En ningún caso podrá ser menor de las dos terceras partes del número de los primeros y de las dos terceras partes del valor nominal del segundo."

De los estatutos del banco demandado, así como de la ley supletoria, se ve claramente que no es necesario el acuerdo unánime de los accionistas para que puedan reformarse o modificarse los estatutos de una sociedad anónima.

Extremando la discusión en cuanto a la reserva o no reserva que pueda tener el Estado para modificar los estatutos de una corporación, se ha llegado a decir que aún la naturaleza pública del negocio de una corporación privada equivale a una reserva implícita por parte del Estado del

poder que tiene para someter la corporación a su reglamentación en forma muy parecida al poder ejercido con corporaciones que están constituídas bajo una reserva expresa del derecho de reglamentación que tiene el Estado. 7 R. C.L. 618.

La evolución y desarrollo de las sociedades anónimas en la legislación española, demuestra por otro lado, que en los cambios de organización y constitución de las mismas han existido disposiciones transitorias que han permitido la continuidad de las sociedades anónimas existentes que deseaban acogerse a la nueva legislación, sin que ello significara la creación de una nueva entidad ni alteración alguna en su personalidad.

La sociedad anónima hizo su aparición en la ley española al publicarse el Código de Comercio de 1829, pues las ordenanzas de Bilbao no hablaban para nada de esta clase de sociedades. Enciclopedia Jurídica Española, tomo 7, pág. 372. Era necesario someter sus escrituras de constitución al examen de los tribunales, cuya aprobación era necesaria para su funcionamiento legal, artículo 293, así como su inscripción en el registro público. La ley de 28 de enero de 1848, reformó el Código de Comercio sobre la constitución de las sociedades anónimas, exigiendo su publicidad y aprobación por el Gobierno. Después de esta reforma empezaron a aparecer aquellas sociedades anónimas especiales que por no poder funcionar con las reglas generales que contenía el Código de 1829 fueron objeto luego de una serie de disposiciones legales complementarias de aquél. La Ley de 28 de enero de 1856 establece las sociedades anónimas de crédito precursoras de los bancos o sociedades anónimas dedicadas a las operaciones de crédito.

El decreto de 28 de octubre de 1868 vino a derogar la ley de sociedades anónimas de 28 de enero de 1848 restableciendo las prescripciones del Código de 1829 en cuanto a las mismas, ínterin no se legislase sobre la materia, sin perjui-

cio de que las entidades existentes pudieran elegir, previo acuerdo tomado en junta general de accionistas, entre continuar por la ley derogada de 1848 o por el Código de Comercio. Alcubilla, Diccionario de Administración, tomo 2, pág. 496.

Esta era una disposición transitoria, dejándose la elección a los accionistas y si tal hacían, optando por el primitivo Código de 1829, no había solución de continuidad, subsistiendo la misma entidad.

El espíritu de la revolución española en 1868 ya se infiltraba en las leyes, y el decreto de 5 de febrero de 1869, expedido por el Ministerio de Fomento, establece bases generales para dar condiciones de libertad a las instituciones de crédito. A esto sigue la ley de 19 de octubre de 1869 que declara libre la creación de bancos y sociedades de crédito y mercantiles e industriales.

Como puede verse del articulado de esta ley, en ella se hacen innovaciones que modifican la constitución de los bancos y otras entidades, pero en la misma se establece el precepto que autoriza la transición de un sistema a otro sin variar la personalidad de los ya existentes. El artículo 13 de dicha ley dice:

"Los Bancos y las sociedades existentes en la actualidad con autorización del Gobierno continuarán rigiéndose por sus estatutos, sin perjuicio de poder optar a los beneficios que esta Ley otorga a las que en adelante se constituyan, siempre que así lo acuerden sus asociados en junta general, expresamente convocada al efecto, por el número de votos que prescriban sus reglamentos para modificar el pacto social, o por mayoría de las dos terceras partes del capital cuando en los mismos no se haya previsto esta circunstancia. En el caso expresado, dichas compañías quedarán sujetas a todas las prescripciones de esta Ley."

Para las entidades que en sus estatutos no tenían reglas para modificar el pacto social, se decretó a ese fin la ley de 21 de enero de 1870, supletoria para estos casos, autorizando a tales entidades la reforma de sus estatutos a fin de aco-

modarlos a la nueva ley, sin significar por ello la creación
de una nueva entidad. Dicha ley dice así:

"Artículo único.—Los Bancos y Sociedades existentes en la ac-
tualidad con autorización del Gobierno, en cuyos estatutos o regla-
mentos no se hubiere previsto el caso de reformarlos, podrán ha-
cerlo en uno o más de sus artículos, si reunidos los socios en junta
general, convocada para este objeto, así lo acordasen por un número
de votos que represente las cuatro quintas partes de las acciones
de que se compone el capital social; entendiéndose que estas refor-
mas no podrán nunca afectar ni a los derechos de los acreedores, ni
a los especiales que puedan tener algunos socios que no sean comu-
nes a todos. Si de primera convocatoria no se reuniese, presente o
representado el número de votos correspondientes a las cuatro quin-
tas partes de las acciones que constituyan el capital social, en reu-
nión de segunda convocatoria, bastará que se halle presente o re-
presentada la mayoría de las acciones del mismo capital."

Viene por último el Código de Comercio español de 1885,
hecho extensivo a Puerto Rico por Real Decreto de 28 de
enero de 1886, y bajo el cual se constituyó el banco deman-
dado. En este Código se ha unificado la múltiple legisla-
ción que existía después del Código de 1829. En él se esta-
blecen las reglas para la constitución y organización de las
sociedades anónimas en general y para las especiales de
compañías de crédito, bancos de emisión y descuento, etc.
Artículos 151 y siguientes. En esta materia se han introdu-
cido verdaderas innovaciones y la ley, previsora de que las
entidades existentes pudieran acogerse a las nuevas refor-
mas, debidas sin duda al desarrollo incesante de tales insti-
tuciones, establece la disposición transitoria para que ellas,
conservando siempre su personalidad, modificasen sus esta-
tutos. Y así el artículo 159 dispone:

"Las compañías anónimas existentes con anterioridad a la publi-
cación de este Código, y que vinieren rigiéndose por sus reglamentos
y estatutos, podrán elegir entre continuar observándolos o someterse
a las prescripciones del Código."

En armonía con este artículo se redactó el artículo 2 del

Real Decreto de 28 de enero de 1886, que hizo extensivo a Puerto Rico el Código de Comercio, prescribiéndose:

"Las Compañías existentes en 30 de Abril de 1886, deberán ejercitar el derecho que les otorga el art. 159 del Código de Comercio, por medio de un acuerdo adoptado en junta general extraordinaria, convocada expresamente con arreglo a sus estatutos, y en su caso conforme a la ley de 21 de Enero de 1870, que se declara aplicable a las islas de Cuba y Puerto Rico. . . . . ." Código de Comercio anotado por Romero Girón, pág. 646.

Y la ley de 21 de enero de 1870 es la que hemos copiado, como regla suplementaria para los casos en que nada se hubiese prescrito en los estatutos de las entidades existentes para la reforma o modificación de los mismos.

[4, 5] Todos estos precedentes ponen de manifiesto claramente que no es una novedad la sección 4 transitoria de la ley de 1923, haciendo ésta aplicable a los bancos que actualmente estuvieren haciendo negocios en Puerto Rico. Esta ley obedecía a las exigencias de nuevas necesidades operadas con motivo del cambio de nuestras instituciones políticas, las que necesariamente habían de influir en el desarrollo de los intereses materiales y especialmente del comercio, que siendo una fuerza vital que por sí misma propende siempre a aumentarse, había tomado un incremento demasiado notable para dejar de percibirse en los últimos años y en una codificación como la del Código de Comercio español, que ya data de años y que en la misma España se clama por su reforma, resultaba insuficiente para establecer sobre bases más sólidas las operaciones de banca, ya que los bancos se han multiplicado, los depósitos de dinero se han aumentado con el crecimiento de las riquezas, el mismo gobierno era un cliente importante por sus grandes depósitos en dichas instituciones y todo reclamaba una legislación uniforme, que se armonizara con el nuevo ambiente, y que tuviera por objeto una garantía eficaz y segura para el público, la que redundaba en beneficio de los propios accionistas, haciendo más seguros y fructíferos sus fondos.   La ley

de 1923 lo que establece, por consiguiente, es un sistema
uniforme que comprende tanto a los bancos de nueva crea-
ción como a los existentes. A éstos se les requiere para
que entren a figurar bajo el plan armónico que cobija por
igual a tales instituciones y para nada se les exige que al-
teren su personalidad ni que para ello se requiera el con-
sentimiento unánime de los accionistas. La cuestión que
puede suscitarse, sin embargo, para estos bancos existentes,
no es la forma o modo de incorporarse, que por ser una
cuestión de procedimiento no tiene gran importancia; y el
cual, como cosa natural y lógica, no puede ser lo mismo que
la seguida por los bancos de nueva creación, del mismo modo
que el procedimiento seguido para la reincorporación de un
banco nacional en banco del estado y viceversa, no puede
ser idéntico al de esos mismos bancos que se organizan por
primera vez; lo importante sería, como sostiene el abogado
del banco demandado, ver si las cláusulas de incorporación
están o no de acuerdo con el modo de funcionar dichos ban-
cos y no varían su naturaleza. Pero no ha habido cambio
sustancial. El banco demandado sigue funcionando bajo el
mismo nombre. Su término de vida legal, de 75 años, que
se estipula en la escritura de constitución, no se interrumpe,
pues si bien en las cláusulas de incorporación (cláusula 4ª.)
se establece como término de duración 45 años, éste es el
tiempo que precisamente le faltaba al banco demandado
para completar dichos 75 años, por haberse constituído en
1894. El objeto de los negocios a que se dedica el banco
demandado no ha sido variado. Si se hace un examen com-
parativo del artículo 3 de los estatutos primitivos del banco
que especifica las operaciones a que se dedicaba, con la sec-
ción 3 de la ley de 1923 que señala las diversas operaciones
de los bancos, se verá que el banco demandado tendrá el
mismo objeto y continuará practicando sin alteración todas
las operaciones de banca que venía haciendo. Aquí tampoco
la ley de la continuidad no se interrumpe. La variación en

este punto era lo único que hubiera podido ser objeto de discusión. Generalmente a esto es que se refieren las citas de los demandantes y que está resumida en el comentario contenido en la obra de Fletcher, tomo 6, pág. 6807.

En la misma obra, tomo 7, pág. 8469, se analiza lo que significa reincorporación y se lee lo siguiente:

"Sección 4839.—Reincorporación como una especie de reorganización. La palabra 'reincorporación' parece no haber sido definida judicialmente, pero su significado, por lo menos en un sentido general, es aparente. Existe una reincorporación cuando una corporación existente archiva sus cláusulas, de acuerdo con una ley que lo autorice, y obtiene un nuevo certificado. Hablando estrictamente, esto no es otra cosa que una enmienda a las cláusulas de incorporación. De acuerdo con esta teoría en Nueva York una ley dispone la reincorporación de cualquier corporación por acciones ya existente, con ciertas excepciones, bajo las cláusulas de la Ley de Corporaciones Comerciales, y fija detalladamente el procedimiento de reincorporación; pero la reincorporación dispuesta en dicha ley no es otra que la adopción y el archivo de un certificado contentivo de ciertos hechos con el fin de hacer la corporación existente, como dice la ley, 'una corporación organizada bajo este capítulo (Ley de Corporaciones Comerciales)' en vez de una corporación organizada bajo cualquier otra ley.

"Reincorporación, según se usa la palabra generalmente y según disponen los estatutos de muchos estados, no es lo mismo que lo que ordinariamente se conoce por reorganización. Reorganización, de acuerdo con el significado usual de la palabra, significa la creación de una nueva compañía que se hace cargo del activo de otra corporación, mientras que reincorporación, según se usa esa palabra generalmente, se asemeja más bien a la enmienda de las cláusulas de incorporación, procedimiento al cual se recurre, bien para corregir errores en la corporación original o para aprovecharse de los beneficios de una ley aprobada con posterioridad a la fecha de incorporación, o para prolongar la vida de la corporación.

"Las leyes con frecuencia disponen la reincorporación de ciertas compañías especiales, tales como compañías de seguro o bancarias.

"Generalmente, de acuerdo con las leyes, ello no equivale a la creación de una nueva corporación sino que la compañía sigue siendo la misma que existía antes de la reincorporación.

"La autorización para reincorporarse debe estar basada en el voto de los accionistas o de los miembros y no de los directores."

Por lo demás, en los estatutos de incorporación del banco nada fundamental puede encontrarse que afecte los derechos de los accionistas o que destruya la identidad de la personalidad del banco existente. Aquellos cambios que el juez inferior examina en su opinión, entre las cláusulas de incorporación y los estatutos primitivos del banco, refiriéndose, por ejemplo, a las facultades del presidente del banco para convocar a los accionistas en junta extraordinaria y a la forma en que válidamente deben quedar constituídas, son cuestiones de forma o procedimiento para conducir los negocios y que caen bajo el control del *police power* inherente a la Legislatura de Puerto Rico. Es verdad que el poder de la legislatura no puede ser arbitrario u opresivo en tal sentido ni en ningún otro, y que su reglamentación debe ser razonable, pero bajo el ejercicio del *police power* los estados son los que tienen la iniciativa para determinar cuál es la reglamentación más necesaria y apropiada para la conducción del negocio bancario y en último término las cortes son las llamadas a intervenir decidiendo finalmente si las reglas así prescritas son justas y razonables. 3 R.C.L. 380. De ahí que la teoría de los demandantes sosteniendo que el banco demandado con la incorporación queda a merced de la autoridad de la legislatura para ser disuelto en cualquier momento por ser su criatura, es equivocada. Lo que ocurre es que aunque los bancos y las corporaciones existan por la voluntad contractual de sus incorporadores, están obligadas a cumplir las prescripciones de la ley que es también parte de la carta de constitución de tales organismos (7 R.C.L. 537), y las medidas fiscalizadoras y de intervención del gobierno en las mismas, que ya venían en vigor desde 1902, artículo 354 del Código Político, no tienen más objeto que hacerlas ajustarse a la ley en su funcionamiento

y operaciones, y no haciéndose así era entonces que se le puede llevar hasta su disolución y liquidación.

[6] Se sostiene, además, que la sección 4 de la Ley No. 18 de 1923 no está en armonía con el título de la misma y que por esta razón es nula de acuerdo con lo que dispone la sección 34 de la Ley Orgánica de Puerto Rico de 1917. La parte de la sección 4 que se alega no estar cubierta por el título de la ley dice: ". . . . los bancos que estuvieren haciendo negocios en Puerto Rico y que no hayan sido incorporados, deberán incorporarse de acuerdo con las disposiciones de esta Ley, dentro de un plazo de seis meses contados desde la fecha en que esta ley empiece a regir. El párrafo del artículo 34 del Acta Orgánica a que se refieren los demandantes en el caso No. 3883, lee así:

"No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título; pero si algún asunto que no esté expresado en el título fuere incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título."

Y el asunto (*subject*) de la ley, tal como se contiene en el título, es: "Ley reglamentando los bancos y las operaciones bancarias en Puerto Rico." Parece comprensible que siendo ésta una ley de carácter uniforme para poner bajo una misma reglamentación a todo banco de nueva o antigua creación que funcione como tal en Puerto Rico, la disposición haciéndola extensiva a los bancos existentes al tiempo de promulgarse la ley, esté incluída en el título. Una situación análoga se presentó en el caso de *State* v. *Woodmansee,* 1 N. D. 246, 46 N. W. 970, 11 L.R.A. 420. Este caso es muy importante en su aplicación a los demás méritos de este caso y se cita como autoridad en el de *Noble State Bank* v. *Haskell, supra,* pero concretándonos a su interpretación del título de una ley sobre bancos en relación con las materias

que ella contenía, parecida en su objeto a nuestro estatuto, la corte se expresó así:

"El recurrente alega además que la sección 27 es anticonstitucional por el hecho de que viola las disposiciones del artículo 61 de la constitución del estado que dice así: 'No se aprobará ningún proyecto de ley que contenga más de un asunto el cual 'deberá ser claramente expresado' en su título; pero cualquier ley que infrinja esta disposición será nula únicamente en cuanto a aquella parte de ella que no haya sido expresada en su título.' El peticionario alega que la sección 27, al prohibir y castigar el dedicarse al negocio de la banca privadamente no se refiere al asunto expresado en el título de la ley. Esta contención carece de fundamento. El asunto de la ley, tal y como se expresa en el título, es 'Bancos del Estado;' pero tal título incluye y comprende no solamente los bancos del estado, sino también cualquier negocio bancario efectuado dentro del estado o que tenga relación con la banca del estado. Al crear los bancos del estado y proveer para su administración, la ley convierte el negocio de los bancos en una franquicia corporativa y al prohibir y castigar toda otra clase de negocios bancarios en nuestra opinión es estrictamente inherente a tal asunto. Disposiciones constitucionales parecidas pueden encontrarse en casi todos, si no en todos, los estados usando algunos estados la palabra 'objeto' en vez de 'asunto' (*subject*), según aparece de nuestra constitución. Esta disposición intenta anticipar lo que el Juez Cooley denomina con el nombre de legislación 'rog-rolling,' para impedir así legislación que no sea completamente comprendida por los legisladores, así como para impedir toda clase de sorpresas o malas interpretaciones por parte del público. Pero se ha resuelto uniformemente que tales disposiciones pueden recibir una interpretación razonable y no técnica, y que ningún extremo debe invalidar un estatuto siempre que tal extremo se relacione exclusivamente con el mismo asunto o fuera afín a o auxiliar del mismo. La interpretación de esta disposición ha sido sometida a esta corte en innumerables casos, y, aunque tal interpretación ha sido uniforme, su aplicación ha cubierto un campo de legislación tan extenso y asuntos tan variados que los casos parecen ser confusos e inconsistentes, así es que no puede obtenerse gran beneficio de una cita de autoridades. Sin embargo, encontramos los siguientes casos sosteniendo nuestros puntos de vista en este caso: Cooley, Const. Lim. (5a. ed.) 176; People v. Parks, 58 Cal. 635; Davis v. State, 61 Amer. Dec. 331, y nota; Fahey v. State, 27 Tex. App. 146, 11 S. W. Rep. 108; O'Leary v.

County of Cook, 28 Ill. 538; Alleghany County Home's Case, 77 Pa. St. 77.''

Llegamos finalmente a la conclusión que la Ley No. 18 de 1923 reglamentando los bancos, etc., es constitucional y que el acuerdo del banco demandado de mayo 19, 1924, acordando su incorporación es válido porque los mismos estatutos (art. 75) por los cuales se rige la demandada desde su fundación, daba facultades a los accionistas para hacerlo.

*Por todo lo cual las sentencias apeladas en los casos Nos. 3804 y 3805 deben revocarse declarándose sin lugar las demandas, sin especial condenación de costas, y confirmarse la pronunciada en el caso No. 3883 que declaró sin lugar la demanda de injunction.*

El Juez Asociado Señor Wolf disintió.[1]